## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| FORIS DAX INC. d/b/a CRYPTO.COM, | § § § | |
| Plaintiff, | § | |
| v. | § § | Civil Action No. _____ |
| U.S. SECURITIES AND EXCHANGE COMMISSION; GARY GENSLER; CAROLINE A. CRENSHAW; JAIME E. LIZÁRRAGA; HESTER M. PEIRCE; and MARK T. UYEDA, in their official capacities, | § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Foris DAX Inc. ("Crypto.com") seeks declaratory and injunctive relief to prevent the Securities and Exchange Commission ("SEC") from unlawfully expanding its jurisdiction to cover secondary-market sales of certain network tokens sold on Crypto.com's platform.

2.      A "network token" is a digital asset used to access or interact with a public blockchain network.  Network tokens are transferable digital units that can be bought and sold on secondary markets.

3.      Network tokens, including the "Targeted Network Tokens"[1] at issue in this case, are not themselves securities under the Securities Act of 1933 ("Securities Act") or the Securities Exchange Act of 1934 ("Exchange Act").  The SEC has conceded this fact in multiple administrative and federal court cases involving Crypto.com's competitors.

4.      Despite this concession, the SEC has asserted jurisdiction over secondary-market sales of network tokens through a barrage of enforcement actions that rely on an unlawful *de facto* rule that nearly all network tokens, including the Targeted Network Tokens, are a newly defined financial instrument called a "Crypto Asset Security" subject to regulation under the Securities Act and the Exchange Act ("Rule").

5.      Rather than relying on statutory authority or undertaking notice-and-comment rulemaking, the SEC invented the term Crypto Asset Security out of whole cloth to expand its jurisdiction over the digital asset industry.  The term has no foundation in the Securities Act or Exchange Act.  Nor does it resemble any financial instrument defined by those laws.

---

[1] The Targeted Network Tokens are: SOL, ADA, BNB, FIL, FLOW, ICP, ATOM, ALGO, NEAR, and DASH.  *See infra* ¶¶ 73-74, 80.

6.      The SEC has aggressively weaponized the Rule against secondary-market network token sellers by defining Crypto Asset Securities to encompass nearly every network token in existence, arbitrarily exempting only bitcoin and ether from its scope despite the substantial similarities of those assets to the Targeted Network Tokens.

7.      The SEC is now threatening enforcement action against Crypto.com in regard to secondary-market sales of network tokens on its platform, even though the SEC does not have jurisdiction over those sales and cannot lawfully regulate their market absent action from Congress, a fact recognized by members of the Commission itself.  *See infra* ¶¶ 128-131, 188.

8.      The Rule is inconsistent with federal law, exceeds the SEC's statutory authority, and violates the Administrative Procedure Act ("APA").

9.      Instead of heeding calls to participate in formal rulemaking, the SEC has sought to expand its regulatory scope by enforcing the Rule through litigation.  As SEC Commissioner Mark Uyeda recognized: "For too long, the Commission's approach to crypto asset regulation has been to use enforcement actions to introduce novel legal and regulatory theories."[2]

10.      This suit contends the SEC's "regulation by enforcement" strategy—*i.e.*, enforcing the Rule through litigation—is outside the statutory limits set by Congress.

11.      Crypto.com seeks a declaration that the Targeted Network Tokens sold on its platform are not securities or sold as part of a securities transaction and that it does not operate as an unregistered securities broker-dealer or securities clearing agency with respect to those sales.

12.      Crypto.com further requests the Court set aside the Rule and permanently enjoin the SEC from enforcing the Rule against Crypto.com.

---

[2] Mark T. Uyeda, SEC Commissioner, Statement on Proposed Rule Regarding the Safeguarding of Advisory Client Assets (Feb. 13, 2023), https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-custody-021523.

## JURISDICTION AND VENUE

13.    This Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331.  This case arises under the federal securities laws and the APA.

14.    Section 702 of the APA addresses agency action.  It provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

15.    The SEC has, through agency action, adversely affected Crypto.com.  5 U.S.C. §§ 702, 551(13), 551(4); *Apter v. HHS*, 80 F.4th 579, 590–91 (5th Cir. 2023); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 599 (N.D. Tex. 2021), *aff'd in relevant part sub nom*. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023); *Chamber of Commerce of United States of America v. CFPB*, 691 F. Supp. 3d 730, 734 (E.D. Tex. Sept. 8, 2023).

16.    The SEC has determined, through agency action, that network tokens (except for bitcoin and ether), including the Targeted Network Tokens, are Crypto Asset Securities, and thus securities under the Securities Act and the Exchange Act.

17.    Based on this determination, the SEC has issued a Wells notice to Crypto.com, formally threatening to bring an enforcement action against Crypto.com for operating as an unregistered broker-dealer and securities clearing agency under the federal securities laws.  The SEC has filed comparable enforcement actions against companies that are similarly situated to Crypto.com.

18.    Section 704 of the APA addresses final agency action.  It provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review."  5 U.S.C. § 704.

19.     A court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2).

20.     The SEC's determination that nearly all network tokens, including the Targeted Network Tokens, are Crypto Asset Securities subject to regulation under the Securities Act and the Exchange Act is a legislative rule that is reviewable under the APA. 15 U.S.C. § 77b(a)(1), § 78c(a)(10).

21.     The Rule is final agency action.  It is the consummation of the agency's decision-making process (done without following the APA) that Crypto Asset Securities are themselves a category of security under the SEC's oversight and that secondary-market sales of these instruments, including the Targeted Network Tokens, are securities transactions regulated under the federal securities laws.

22.     The Rule determines Crypto.com's legal rights and obligations and has the force of law because it requires secondary platforms like Crypto.com that engage in or facilitate secondary trades in Targeted Network Tokens (and network tokens generally) to comply with federal securities laws and register as securities broker-dealers and securities clearing agencies to avoid SEC enforcement actions.

23.     The Rule is binding because the SEC has taken enforcement actions based on the Rule against secondary-market platforms that trade or facilitate the trading of Targeted Network Tokens (and other network tokens generally), and the SEC threatens imminent enforcement against Crypto.com on this basis.

24.     As alleged below, *see infra* ¶¶ 146-163, evidence of the Rule is well-documented, including in the SEC's public statements, regulatory actions, and enforcement actions against companies similar to Crypto.com.  On information and belief, the Rule is also documented in the agency's internal memoranda and correspondence.

25.     The SEC cannot shield itself from judicial review by refusing to publish the Rule because "[a]gency action generally need not be committed to writing to be final and judicially reviewable." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020); *see, e.g.*, *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 192–93 (5th Cir. 2023) (reviewing FDA's *de facto* rule banning non-tobacco-flavored e-cigarettes manifesting in the denial of every application of such e-cigarettes).

26.     When an agency enacts a new substantive rule, it "cannot evade the notice and comment requirements of the APA by avoiding written statements or other 'official' interpretations of a given regulation."  *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001) (agency's "new policy" applied in adjudication "is a substantive rule for purposes of the APA").

27.     In other words, an agency "may not cloak its development—and industry-wide application—of a new [rule] in the guise of simple adjudicative orders."  *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 239 (5th Cir. 2019) (agency's adjudicative orders "evince the creation of a new substantive rule" subject to the APA).

28.     As evidenced by various statements and regulatory actions, including enforcement actions against secondary-market platforms, the SEC has defined Crypto Asset Securities to be securities, and on that basis it has categorized secondary-market sales of most network tokens,

including the Targeted Network Tokens, to be securities transactions under its jurisdiction.  *See infra* ¶¶ 146-163.

29.     Crypto.com has no other adequate remedy to challenge the validity of the Rule because Congress has not established any other procedure to obtain judicial review of the Rule.

30.     In addition to seeking relief under the APA, Crypto.com also seeks relief under the Declaratory Judgment Act, which authorizes a court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

31.     Crypto.com asserts that secondary-market transactions of network tokens, including the Targeted Network Tokens, on its platform are not securities transactions and Crypto.com does not act as a securities broker-dealer or securities clearing agency under the federal securities laws with respect to such sales.   An actual controversy exists between Crypto.com and Defendants over these issues.

32.     This suit is ripe for judicial review.  Declaratory judgment is appropriate because the SEC has taken a definitive position on the purely legal question about whether the Targeted Network Tokens (and other network tokens) are securities subject to the agency's regulatory authority.   Also, the Rule is final agency action that violates the APA and is subject to judicial review.

33.     Crypto.com would suffer hardship if judicial review is withheld, because it is the direct object of the Rule, and the SEC has threatened to take imminent enforcement action against Crypto.com premised on alleged violations of the Rule.

34.     Absent judicial review by this Court, Crypto.com will continue to operate its business with the ongoing threat of the SEC enforcing the Rule hanging over it.

35.    Venue is proper under 28 U.S.C. §§ 1391(e)(1)(C) because Crypto.com resides in this judicial district.

## PARTIES

36.    Plaintiff Foris DAX Inc. is a corporation organized under the laws of the state of Delaware, with its headquarters in Tyler, Texas.   It operates under the business name of Crypto.com.

37.    Defendant U.S. Securities and Exchange Commission is an agency of the United States federal government.

38.    Defendant Gary Gensler is the Chair of the SEC.  He is named in his official capacity only.

39.    Defendant Caroline Crenshaw is a Commissioner of the SEC.  She is named in her official capacity only.

40.    Defendant Jaime Lizárraga is a Commissioner of the SEC.  He is named in his official capacity only.

41.    Defendant Hester M. Peirce is a Commissioner of the SEC.  She is named in her official capacity only.

42.    Defendant Mark T. Uyeda is a Commissioner of the SEC.  He is named in his official capacity only.

## FACTUAL ALLEGATIONS

I.    **Background on Network Tokens and Crypto.com**

A.    **Bitcoin and the Invention of Blockchain Technology**

43.    Although the primary issue in this case is the SEC's regulatory overreach, because the function and nature of blockchain technology is important to the legal claims presented, a brief explanation of its history is set forth here.

44.    In 2008, Satoshi Nakamoto created the Bitcoin network as a decentralized online payment system.  Its public ledger, or blockchain, records transfers of its native token, bitcoin (with a lowercase 'b' to distinguish it from the network), without relying on any intermediary to complete transactions.

45.    Most digital services are controlled by a few individuals or companies, centralizing power and allowing them to restrict or censor platform activities.  This also makes them vulnerable to attacks from bad actors.

46.    Blockchain networks like Bitcoin were created to eliminate single points of failure by removing central intermediaries and distributing responsibility across the network, decentralizing control and reducing reliance on a single entity.

47.    Bitcoin's blockchain is open source, meaning anyone can download it, run it, and propose changes to it.  In this respect, the Bitcoin network exists on the thousands of computers that run the software operating the Bitcoin protocol.

48.    Neither Satoshi Nakamoto nor any other individual or company owns or has control over the Bitcoin network or its protocol.

49.    Just as it is costly to operate a centralized network, maintaining the infrastructure of a global decentralized network requires a tremendous amount of computing power.

50.    The ingenuity of Bitcoin was that it was designed such that the "miners" who use their computer's energy to maintain the network are incentivized to do so by the network itself.

51.    When a transaction is submitted to the Bitcoin network and validated by a miner, that miner is rewarded with newly minted bitcoin, which is created and distributed automatically by the network's protocol.

52.     The bitcoin produced by the Bitcoin network exists solely as a record of ownership published on the Bitcoin network's public ledger.

53.     Once created, bitcoin can be used for peer-to-peer transactions, other network functions, or sold on secondary-markets that operate independently of the network.

54.     Crypto.com acquires bitcoin through a variety of secondary-market sources and then resells the bitcoin to its customers.

55.     Since 2018, the SEC has acknowledged publicly that these types of secondary-market transactions of bitcoin are not securities transactions. *See infra* ¶¶ 124-127.

56.     This year, the SEC further affirmed that secondary sales of bitcoin are not securities transactions, when it approved, on January 10, 2024, the listing and trading of spot bitcoin ETPs under the rules for non-securities commodity-based trust shares.[3]

### B.      Ethereum and the Evolution of Blockchain Technology

57.     Bitcoin's creation inspired programmers around the world to build on its design, leading to the development of other blockchain networks optimized for different functions.

58.     In 2014, a 19-year-old programmer named Vitalik Buterin envisioned a blockchain with more advanced programming capabilities. Working with a dedicated group of co-founders, he created the Ethereum network and its native token, ether.

59.     Ether functions not only as a currency but as a resource required to execute and create programming functions on the network.

---

[3] The SEC's approval followed a determination by the D.C. Circuit Court of Appeals finding the SEC's initial refusal to approve the ETP to be "arbitrary and capricious." *See Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1249 (D.C. Cir. 2023); *see also* Securities and Exchange Commission, Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amendments Thereto, to List and Trade Bitcoin-Based Commodity-Based Trust Shares and Trust Units, Exchange Act Release No. 99306, 2024 WL 178434 (Jan. 10, 2024).

60.     The collection of computers maintaining the Ethereum network collectively operate as the Ethereum Virtual Machine ("EVM"), a global supercomputer capable of running various decentralized applications.

61.     These applications, called "smart contracts," can be created, deployed, and executed by anyone in the world, provided they pay ether to the network.

62.     The only way for developers to create or execute applications on Ethereum, or for users to interact with these decentralized applications, is by owning and spending ether.

63.     Thousands of independent applications on Ethereum require ether for access, including decentralized file storage, gaming platforms, social media, digital art, trading platforms, and more.

64.     Before Ethereum's launch, its founders promoted the network by selling ether on the primary market to raise development funds, highlighting future use cases and making predictions about ether's value.

65.     Ethereum's founders promoted ether and its ecosystem before Ethereum's launch and continue to do so to this day.

66.     Crypto.com acquires ether through a variety of secondary-market sources and resells that ether to its customers.

67.     Since 2018, the SEC has acknowledged publicly that these types of secondary-market ether transactions are not securities transactions.  *See infra* ¶¶ 124-127.

68.     The SEC affirmed that ether is not a security when sold on secondary-markets on May 23, 2024, when it approved the listing and trading of spot ether ETPs under the rules for non-securities commodity-based trust shares.[4]

69.     In summary, the SEC's position is that bitcoin and ether themselves are not securities and secondary-market sales of bitcoin and ether are not securities transactions.

### C.     The Targeted Network Tokens Sold on Crypto.com's Platform

70.     Since Ethereum's launch, developers worldwide have created hundreds of competing blockchain networks, enabling coders to build thousands of decentralized applications on their infrastructure.

71.     This case specifically concerns blockchain networks that use native network tokens similarly to how the Bitcoin and Ethereum networks use bitcoin and ether—as network-based incentives to reward the operators of computers maintaining the network or as a resource required by the network to create or utilize smart contract applications.

72.     The SEC has determined that "the vast majority" of the network tokens developed over the last 15 years, seemingly everything except for bitcoin and ether, fall under its jurisdiction as a newly identified category of financial instruments called Crypto Asset Securities.[5]

---

[4] *See* Securities and Exchange Commission, Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amendments Thereto, to List and Trade Shares of Ether-Based Exchange-Traded Products, Exchange Act Release No. 100224, 2024 WL 2746091 (May 23, 2024); *see also* Defendants' Motion to Dismiss Pursuant to FRCP 12(b)(1) and 12(b)(6), *Consensys Software Inc. v. Gensler*, No. 4:24-cv-00369, ECF No. 37, at *12 (N.D. Tex. July 24, 2024) (SEC relying on its declining to bring an enforcement action related to secondary sales of ether as reason to moot action seeking declaratory judgment that secondary sales of ether are not securities transactions).

[5] *See, e.g.*, Gary Gensler, SEC Chair, *We've Seen This Story Before – Remarks Before the Piper Sandler Global Exchange & Fintech Conference* (June 8, 2023), https://www.sec.gov/newsroom/speeches-statements/gensler-remarks-piper-sandler-060823 (addressing what constitutes a "crypto asset security" and stating that "the vast majority of crypto tokens meet the investment contract test"); *see also* Gary Gensler, SEC Chair, *Prepared Remarks*

73.    At issue in this case are several network tokens previously identified by the SEC as representative samples of Crypto Asset Securities which are also sold on Crypto.com's secondary-market platform (the "Platform").

74.    These network tokens go by the following symbols: SOL, ADA, BNB, FIL, FLOW, ICP, ATOM, ALGO, NEAR, and DASH ("Targeted Network Tokens").

75.    Through the Platform, Crypto.com buys and sells a variety of network tokens, including bitcoin, ether, and the Targeted Network Tokens.

76.    All network tokens sold on the Platform are acquired by Crypto.com on the secondary-market and resold by Crypto.com to its customers for a profit.  Thus, Crypto.com's customers do not purchase Targeted Network Tokens from their issuers or promoters.

77.    Similar to bitcoin and ether, ownership of each Targeted Network Token is a technical prerequisite for using or maintaining an underlying blockchain network and for facilitating transactions or developments occurring on that network.

78.    In form and function, the Targeted Network Tokens are analogous to bitcoin or ether (or both) and are offered and sold on the Platform in the exact same manner as bitcoin and ether.

79.    Crypto.com had no role in developing, promoting, or maintaining the Targeted Network Tokens or their underlying networks, nor any role in the primary issuance or sale of the Targeted Network Tokens into the market.

---

*before the Small Business Capital Formation Advisory Committee* (May 6, 2024), https://www.sec.gov/newsroom/speeches-statements/gensler-sbcafac-05062024 ("I believe that the vast majority of crypto assets are investment contracts."); *see also* Gary Gensler, SEC Chair, *Testimony Before S. Comm. on Banking, Housing, and Urban Affairs* (Sept. 15, 2022), https://www.sec.gov/newsroom/speeches-statements/gensler-testimony-housing-urban-affairs-091522.

80.     Details about each Targeted Network Token are provided below:

a.  SOL is the native token of the Solana network, which was launched in 2017 by the Solana Foundation.  SOL was issued through public and private token sales. SOL is used to pay fees to enter into transactions and use decentralized applications on Solana, to support network consensus, and to vote on future network upgrades.  The Solana blockchain is compatible with the EVM, which means that it follows similar protocols and standards as Ethereum and has comparable capabilities.

b.  ADA is a native token of the Cardano network, which was founded in 2017 by Charles Hoskinson.  ADA was issued through public and private token sales. ADA is used to pay fees to enter into transactions and use decentralized applications on Cardano, to support network consensus, and to vote on proposed changes to the ADA network's software.  The Cardano blockchain is compatible with the EVM and has comparable capabilities.

c.  BNB is a native token of the BNB blockchain and was introduced by Binance in July 2017. BNB was issued through public token sales and private distributions.  BNB is used to pay discounted fees to enter into transactions on the Binance exchange, to access token sales on the platform, to support network consensus, and to vote on governance of the underlying blockchain.  The BNB blockchain is compatible with the EVM and has comparable capabilities.

d.  FIL is the native token of the Filecoin application, which was developed in 2017 by Protocol Labs. FIL was issued through public and private token sales.  FIL is used to pay to store or retrieve data from the Filecoin network, as collateral to guarantee storage services, and to participate in the Filecoin governance process. The Filecoin application is compatible with the EVM and has comparable capabilities.

e.  FLOW is the native token of the Flow blockchain, which was launched in 2020 by Dapper Labs. FLOW was issued through public and private token sales. FLOW is used to pay fees to enter into transactions and use decentralized applications and games on Flow, to create and use other tokens on Flow, to support network consensus, and to vote on future network upgrades.  The Flow blockchain is compatible with the EVM and has comparable capabilities.

f.  ICP is the native token of the Internet Computer network, which was launched in May 2021 by the Dfinity Foundation.  ICP was issued through public and private token sales.  ICP is used to pay fees to enter into transactions and use decentralized applications on Internet Computer, to support network consensus, and to vote on network governance.  The Internet Computer blockchain is compatible with the EVM and has comparable capabilities.

g.  ATOM is the native token of the Cosmos Network, which was launched in 2016.  ATOM was issued through public and private token sales by the

Interchain Foundation. ATOM is used to pay fees to enter into transactions and use decentralized applications on Cosmos Network, to support network consensus, and to vote on network governance through the Cosmos Hub.  The Cosmos blockchain is compatible with the EVM and has comparable capabilities.

h.  ALGO is the native token of the Algorand network, which was launched in 2019 by the Algorand Foundation Ltd.  ALGO was issued through public token sales.  ALGO is used to pay fees to enter into transactions and use decentralized applications on Algorand and to support network consensus. It has comparable capabilities to the Ethereum network.

i.  NEAR is the native token of the NEAR Protocol, which was launched in 2018 by Near, Inc. NEAR was issued through public and private token sales.  NEAR is used to pay fees to enter into transactions and to use decentralized applications on the NEAR Protocol, to support network consensus, and to vote on future network upgrades.  It has comparable capabilities to the Ethereum network.

j.  DASH is the native token of the Dash blockchain network, which was launched in 2014 by Evan Duffield.  DASH is a fork of the Bitcoin blockchain. Like Bitcoin, DASH is issued into the primary market as network rewards to those who help maintain consensus on the network.  DASH is used to pay fees to enter into transactions on Dash, to support network consensus, and to vote on future network upgrades. It has comparable capabilities to the Bitcoin network.

81.  Despite the functional similarities between the Targeted Network Tokens, on one hand, and bitcoin and ether, on the other, the SEC does not treat the Targeted Network Tokens the same way it treats bitcoin or ether.

82.  This disparate and arbitrary treatment remains the case even though secondary-market sales of the Targeted Network Tokens on the Platform are legally and commercially indistinguishable from secondary-market sales of bitcoin and ether.

83.  Just like transactions involving bitcoin and ether, every transaction involving the Targeted Network Tokens that occurs on the Platform is merely the sale of a digital product and is not coupled with additional commitments, promises, or expectations from the issuers or promoters of the Targeted Network Tokens.

**D.    Crypto.com Is Targeted by the SEC for Secondary-Market Sales of Network Tokens.**

84.    Since at least February 8, 2023, the staff of the SEC's Division of Enforcement has been conducting an investigation captioned *In the Matter of Crypto.com* (LA-05396) "to determine if violations of the federal securities laws have occurred."

85.    On March 28, 2023, the SEC (acting through a delegation of authority to the Director of the SEC's Division of Enforcement) issued a Formal Order of Investigation of Crypto.com.

86.    That formal order directed the SEC staff to conduct an investigation to determine whether Crypto.com and its affiliates and personnel were engaged in acts or conduct that violated provisions of the Securities Act and Exchange Act, and empowered the staff to subpoena witnesses and require the production of documents.

87.    The SEC's investigation of Crypto.com is premised on the Rule that network tokens, including the Targeted Network Tokens, are Crypto Asset Securities subject to the SEC's authority under the Securities Act and Exchange Act.

88.    In the course of its investigation, the SEC staff issued five subpoenas to Crypto.com and one to a CFTC-regulated U.S. affiliate, seeking the production of documents and information in response to over a hundred individual requests.  The SEC staff also issued dozens of additional voluntary and informal requests to the Company.

89.    On August 22, 2024, the SEC staff sent Crypto.com a Wells notice, stating that it intends to recommend that the SEC bring an enforcement action against Crypto.com under provisions of the Securities Act and Exchange Act based on the SEC's assertion that certain network tokens sold on the Platform are Crypto Asset Securities.

90.     The SEC has refused to provide Crypto.com a complete list of network tokens sold on the Platform that it plans to allege are Crypto Asset Securities.  Instead, it has referred Crypto.com to other enforcement actions in which the SEC has asserted claims based on secondary-market sales of various network tokens, including the Targeted Network Tokens.

91.     Because the SEC has refused to reveal the full list of tokens traded on the Platform that it will assert are Crypto Asset Securities, Crypto.com is focusing this complaint initially on the Targeted Network Tokens.

92.     Based on the SEC's actions, Crypto.com faces an immediate threat of enforcement by the SEC.

93.     The imminent filing of an enforcement action based on the Rule would have significant legal consequences for Crypto.com, including compliance costs and risks to its regulatory licenses and commercial relationships.

## II.    The SEC's Strategy to Regulate Secondary-Market Sales of the Targeted Network Tokens Exceeds the SEC's Congressional Authority and Violates the APA.

### A.    The Boundaries of the SEC's Authority Are Well Established.

94.     The SEC seeks to regulate secondary-market sales of the Targeted Network Tokens as Crypto Asset Securities.  However, its authority is circumscribed by laws enacted long before blockchain technology existed.

95.     Under the Securities Act and Exchange Act, the SEC is authorized to regulate "securities."  That term is defined in the Securities Act as:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on

the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[6]

96.     The definition of a "security" under the Securities Act and Exchange Act does not include every conceivably tradeable item or investment.

97.     For instance, it does not include frequently traded commodities such as oil, copper, cobalt, or the countless other products that are often purchased as investments and enjoy robust secondary-markets, like concert tickets, baseball cards, art, or designer shoes.

98.     Relevant here, the definition of "security" includes a category of financial instrument called an "investment contract."

99.     An investment contract is not a catch-all term that allows the SEC to turn any asset it wishes to regulate into a security.  The term has a well-established meaning dating back to state "blue-sky" securities laws that predate the enactment of the Securities Act and Exchange Act.

100.    As understood at the time the federal securities laws were enacted, the term investment contract was intended to capture an investment made in an issuer that was <u>coupled</u> with a promise from that issuer to conduct some act in furtherance of profits from the venture.

101.    Congress imported this understanding when it passed the Securities Act and Exchange Act without specifically defining an investment contract.[7]

---

[6] *See* 15 U.S.C. § 77b(a)(1).  The Exchange Act uses slightly different terminology than the Securities Act does, but courts have recognized the definitions of "security" in the two statutes are functionally the same.  15 U.S.C. § 78c(a)(10); *see, e.g.*, *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 847 n.12 (1974).

[7] *See* Brief of Securities Law Scholars as Amici Curiae in Support of Coinbase's Motion for Judgment on the Pleadings, *SEC v. Coinbase, Inc.*, No. 23-cv-04738, ECF No. 59, at *9 (S.D.N.Y. Aug. 11, 2023) ("Most relevant here, when defining the 'securities' subject to the new

102.    The Supreme Court recognized as much in 1946 when it issued the seminal case interpreting the term investment contract—*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

103.    In *Howey*, the Supreme Court declared that Congress had incorporated the definition of investment contract that had been "crystallized" in state "blue-sky" securities laws.

104.    With this context in mind, the *Howey* Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party[.]" *Id.* at 293.

105.    In *Howey*, the transaction was for the sale of orange groves. However, those groves alone (and the oranges they produced) were not alleged to be the investment contract itself. The investment contract was the sale of the orange groves <u>coupled</u> with a commitment by the seller to cultivate the groves, sell the oranges, and distribute profits to the owners.

106.    It was the coupling of the land-sale contract with post-sale efforts from the seller that brought the transaction within the SEC's jurisdiction.

107.    The understanding that an investment contract necessarily contains some expectation of profit from the post-sale efforts of the issuer or third party has cabined the SEC's authority over "investment contracts" for nearly eighty years.

108.    The *Howey* Court understood that a distinction existed between the subject of the investment contract (the orange groves), which are not securities, and the overall set of commitments by the issuer to the buyers (promises to cultivate, bring to market, and distribute profits) that together formed the investment contract.

---

national securities legislation, Congress imported the term 'investment contract' wholesale from those blue-sky laws.").

109.    In the decades of cases that followed *Howey*, countless courts likewise recognized that the underlying asset that was the subject of an investment contract—whether cattle,[8] a condominium,[9] or gold[10]—alone is not a security.

110.    It is only when those underlying assets are sold together with promises or commitments by the seller that the overall transaction constitutes an investment contract.

111.    As discussed below, this same distinction applies equally to the sales of network tokens, including the Targeted Network Tokens.

**B.      Secondary-Market Sales of the Targeted Network Tokens on the Platform Do Not Satisfy the *Howey* Test.**

112.    The Targeted Network Tokens bought and sold on the Platform are not any type of security under federal securities laws for several reasons.

113.    <u>First</u>, just like the term Crypto Asset Security is not included in any statutory definition of security, the Targeted Network Tokens also are not among the assets listed in the definition of security in the Securities Act or Exchange Act.  Nor do they have any of the characteristics commonly associated with securities, such as profit-sharing, dividends, or risk of loss in an enterprise.

114.    <u>Second</u>, the Targeted Network Tokens are not sold on the Platform as part of an identifiable investment contract and are not offered as part of a transaction or scheme with their issuers (*i.e.*, original sellers).  Transactions in the Targeted Network Tokens on the Platform do

---

[8] *Long v. Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989); *Waterman v. Alta Verde Indus.*, 833 F.2d 1006 (4th Cir. 1987).

[9] *Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994).

[10] *SEC v. Belmont Reid & Co.*, 794 F.2d 1388 (9th Cir. 1986); *see also In re Living Bens. Asset Mgmt., LLC v. Kestrel Aircraft Co.*, 916 F.3d 528 (5th Cir. 2019) (life insurance settlements).

not include the party that issued the Targeted Network Tokens into the primary market, nor do they include any representations or commitments made by the issuer or promoters.

115.   <u>Third</u>, there is no relationship between Crypto.com and the issuer of the Targeted Network Tokens.  Crypto.com is itself a secondary-market purchaser and merely operates the Platform through which customers can purchase network tokens directly from Crypto.com. Crypto.com purchases the Targeted Network Tokens without any representations or commitments from the Targeted Network Token's issuer, and the issuer receives no remuneration or fees from any secondary-market transactions in those assets on the Platform.

116.   <u>Fourth</u>, there are no representations or ongoing obligations to deliver future value or commitments to the buyer from Crypto.com, such as one would find in nearly every investment contract case since *Howey*.[11]  Crypto.com makes no promises and creates no expectation that it will expend any effort to generate profits or value for the buyers of the Targeted Network Tokens on the Platform.  In fact, Crypto.com's Terms and Conditions specifically state that Crypto.com takes no responsibility for, and has no control of, the value of any network token sold on the Platform.[12]

---

[11] *See* Lewis Cohen et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4282385 (collecting every federal post-*Howey* appellate decision and finding in nearly every instance where an investment contract was found to exist that it contained an ascertainable promise by its issuer to its purchaser that was material to the expectation of profits).

[12] *See Crypto.com App U.S. Terms & Conditions*, CRYPTO.COM (updated June 20, 2024), crypto.com/document/entity_us.pdf, at Section 4.1.2 ("We are not responsible for the market of Digital Assets, and we make no representations or warranties concerning the real or perceived value of Digital Assets as denominated in any quoted currency."); *id.* at Section 5.2.1 ("Crypto.com has not … given any guarantee or representation as to the potential success, return, effect, or benefit … of transacting in [Targeted Network Tokens.]"); *id.* at Section 5.2.2 ("The contents of the Crypto.com App and Site should not be used as a basis for making investment decisions and should not be construed as an attempt to market or promote any type of Digital Asset.").

117. Fifth, the buyer from Crypto.com does not invest any money in any common enterprise—a necessary element for an investment contract to exist—whether that be with the issuer of the Targeted Network Token or Crypto.com generally. Instead, the buyer simply pays Crypto.com for the Targeted Network Token and receives it outright.[13] The monetary value exchanged for the Targeted Network Token is retained solely for Crypto.com's benefit without restriction, limitation, or other obligations.

118. Finally, the Targeted Network Tokens are functionally similar to bitcoin and ether and sold in the exact same way that bitcoin and ether are sold on the Platform. The SEC has concluded secondary-market sales of bitcoin and ether are not securities transactions; treating secondary-market sales of the Targeted Network Tokens differently is arbitrary and capricious.

119. This shows that the elements of *Howey* cannot be met for secondary-market sales of network tokens, including the Targeted Network Tokens, on the Platform.

120. Because the Targeted Network Tokens available on the Platform are not securities or sold as part of a securities transaction, Crypto.com does not operate as an unregistered securities broker-dealer or securities clearing agency with respect to secondary-market sales of the Targeted Network Tokens.

---

[13] *See* Section 3.1 of Addendum 2 of the *Crypto.com App U.S. Terms & Conditions* ("When effecting a [crypto purchase transaction], you are buying such Digital Asset from Crypto.com directly. In this capacity, Crypto.com will be dealing as a principal on its own account and will not be acting as an intermediary or marketplace between other buyers and sellers of Digital Asset.").

### III.    The SEC Shifts from Earlier Positions to Adopt the Rule that Network Tokens Are Crypto Asset Securities.

#### A.    Under Its Prior Administration, the SEC Acknowledged Secondary-Market Sales of Bitcoin and Ether Are Not Securities Transactions.

121.    The SEC's earliest guidance on digital assets came in 2017, when it issued the "DAO Report," which analyzed whether the primary issuance of "DAO tokens" were investment contracts under the Securities Act.[14]

122.    Early enforcement actions by the SEC after the DAO Report centered on potential fraud and registration violations in connection with sales of network tokens in the *primary* market. The primary market is the initial offering from the issuer to the first buyers of the network tokens.

123.    In primary-market offerings, the issuer typically offered and sold network tokens directly to U.S. residents and institutions via transactions that were alleged by the SEC to be unregistered sales of securities because the purpose of the transactions was to raise money to develop the blockchain networks on which the tokens operate.

124.    As the SEC was filing these cases, the SEC's then-Director of the Division of Corporation Finance, William Hinman, gave a speech that he prepared as part of his "official duties,"[15] in which he addressed the subject of the SEC's authority over secondary-market sales of network tokens.  Mr. Hinman stated that a network token "all by itself is not a security, just as the orange groves in *Howey* were not."[16]

---

[14] *See Report of Investigation Pursuant to Section 21(A) of the Securities Exchange Act of 1934: The DAO*, Exchange Release No. 81207, 117 SEC Docket 745, 2017 WL 7184670 (July 25, 2017).

[15] SEC Letter Brief, *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, ECF No. 488, at *3 (S.D.N.Y. May 18, 2022).

[16] William Hinman, SEC Director, Division of Corporation Finance, *Digital Asset Transactions: When Howey Met Gary (Plastic)* Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), https://www.sec.gov/newsroom/speeches-statements/speech-hinman-061418.

125.    With respect to whether a network token that "was originally offered in a securities offering [could] ever be later sold in a manner that does not constitute an offering of a security," Mr. Hinman remarked that secondary-market sales of network tokens would not be deemed securities where:

> there is no longer any central enterprise being invested in or where the [network token] is sold only to be used to purchase a good or service available through the network on which it was created.[17]

126.    With this background, he said that secondary-market sales of bitcoin and ether were not investment contracts, concluding that "applying the disclosure regime of the federal securities laws" to such sales "would seem to add little value."[18]

127.    Two months after Mr. Hinman's speech, in August 2018, then-SEC Chair Jay Clayton endorsed Mr. Hinman's views on secondary-market sales of network tokens.[19]  The SEC has cited Mr. Hinman's speech in guidance issued by agency officials since then.[20]

---

[17] *Id*.

[18] *Id*.  Before making these statements, Director Hinman sought counsel from a number of senior SEC officials, including the office of the chair, division directors, and agency attorneys.  SEC Letter Brief, *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, ECF No. 473, at *4 (S.D.N.Y. Apr. 29, 2022).

[19] Jay Clayton, SEC Chair, *Remarks on Capital Formation at the Nashville 36/86 Entrepreneurship Festival* (Aug. 29, 2018), https://www.sec.gov/newsroom/speeches-statements/speech-clayton-082918.

[20] SEC Strategic Hub for Innovation and Financial Technology, *Framework for "Investment Contract" Analysis of Digital Assets*, U.S. Sec. & Exch. Comm'n, Strategic Hub for Innovation and Financial Technology, at n.1 (Apr. 3, 2019), https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets; *see also Testimony on Oversight of the U.S. Securities and Exchange Commission*: Hearing Before the H. Comm. on Fin. Servs., 115th Cong. 64 (June 21, 2018), (statement of Jay Clayton, SEC Chair, citing Director Hinman's speech and stating, "[o]ur Corporation Finance Division Director recently further outlined the approach staff takes to evaluate whether a digital asset is a security").

**B.    In 2021, the SEC's Current Chair Acknowledged that the SEC Does Not Have Plenary Authority over Digital Asset Transactions and Lobbied Congress for Legislation.**

128.    On April 17, 2021, Gary Gensler was sworn into office as the new Chair of the SEC.  At the start of his tenure, he expressed doubts about the reach of the SEC's authority over network tokens sold in the secondary-market.

129.    In May 2021, he testified before Congress that "the [secondary-market] exchanges trading in [network tokens] do not have a regulatory framework . . . at the SEC."[21]

130.    In August 2021, Chair Gensler wrote a letter to Senator Elizabeth Warren that echoed this same message, stating that "we need additional authorities to prevent transactions, products, and platforms from falling between the regulatory cracks" and that the "legislative priority should focus on [secondary-market] crypto trading . . . platforms."[22]

131.    Chair Gensler's May 2021 testimony before Congress and his call to action in his August 2021 letter acknowledged that Congress has not established a framework for secondary-market trading of network tokens or provided the SEC with authority to regulate secondary-market sales of network tokens.

**C.    The SEC Changes Course and Adopts a Rule that Network Tokens Are Crypto Asset Securities.**

132.    Notwithstanding these pronouncements from Chair Gensler and the SEC's prior interpretive position regarding the application of still unchanged laws and regulations to network tokens, the SEC's history of enforcement since Chair Gensler took office reveals a very different

---

[21] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media and Retail Investors Collide, Part III: Hearing Before the H. Comm. On Fin. Servs.*, 117th Cong. 12 (2021) (statement of Gary Gensler, SEC Chair).

[22] Letter from SEC Chair Gary Gensler to Senator Elizabeth Warren (Aug. 5, 2021), https://www.warren.senate.gov/imo/media/doc/gensler_response_to_warren_-_cryptocurrency_exchanges.pdf.

tale, one that is rooted in increasingly aggressive, unilateral, and expansive assertion of authority over secondary-market sales of network tokens and the broader digital asset industry.

133.    Constrained by his predecessor's endorsement that secondary sales of the two most popular network tokens, bitcoin and ether, are not securities transactions, Chair Gensler focused his attention on other network tokens.

134.    Without any new authorities granted to it by Congress or changes to the relevant regulations since Chair Gensler's 2021 pronouncements, sometime between August 2021 and April 2023, the SEC adopted and began enforcing the *de facto* Rule that seemingly all network tokens other than bitcoin and ether fit into an entirely new category of financial instrument called Crypto Asset Securities that are subject to the SEC's direct oversight.

135.    The SEC has since enforced the Rule through aggressive litigation in a way that is not efficient or fair.[23]   The SEC's invention of the concept of Crypto Asset Securities is as confounding as it is unlawful.[24]

136.    In its early enforcement actions, the SEC argued that network tokens, standing alone, are securities.  However, that allegation has been rejected by federal courts presented with this issue.[25]

---

[23] Hester M. Peirce, SEC Commissioner, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.*, (Feb. 9, 2023), https://www.sec.gov/newsroom/speeches-statements/peirce-statement-kraken-020923 ("Using enforcement actions to tell people what the law is in an emerging industry is not an efficient or fair way of regulating.")

[24] *See SEC v. Payward Inc.*, No. 3:23-cv-06003, ECF No. 90, at *19 (N.D. Cal. Aug. 23, 2024) ("[T]he way the SEC labels the crypto assets at issue—as "crypto asset securities"—is unclear at best and confusing at worst[.]").

[25] *See, e.g.*, *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) (describing the network token as "little more than alphanumeric cryptographic sequence"); *SEC v. Ripple*, 682 F. Supp. 3d 308, 324 (S.D.N.Y. 2023) ("XRP, as a digital token, is not in and of itself a 'contract, transaction, or scheme' that embodies the Howey requirements of an investment contract." (brackets omitted)); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 194 (S.D.N.Y. 2023) ("To be sure, the original UST and LUNA coins, as originally created and when

137.    In the face of this overwhelming authority, the SEC retreated from this original position in litigation, acknowledging that a network token itself is not a security and "is simply a line of code."[26]

138.    But this admission has not stopped the SEC from enforcing the Rule that network tokens, including the Targeted Network Tokens, are Crypto Asset Securities subject to SEC oversight.

139.    In actions against secondary-market platforms, the SEC has proclaimed that Crypto Asset Securities were originally sold in the *primary* market as part of an identifiable investment contract that meets the elements of *Howey*.

140.    From this premise, the SEC claims that all *secondary-market* sales of these tokens are *also* securities transactions because obligations running from their issuers to the initial buyers are automatically imputed to every future secondary-market buyer of the tokens.[27]  As the SEC puts it, a network token inherently "represents and embodies" its original investment contract.[28]

---

considered in isolation, might not then have been, by themselves, investment contracts."); *Payward Inc*., No. 3:23-cv-06003, ECF No. 90, at *20 ("To the extent [the SEC] tries to argue that the individual tokens that form the basis of transactions . . . are investment contracts, or are themselves securities, its argument cannot proceed.").

[26] *SEC v. Binance Holdings Ltd.,* No. 1:23-cv-01599, 2024 WL 3225974, at *21 (D.D.C. June 28, 2024); *see also SEC v. Coinbase, Inc.,* No. 1:23-cv-04738, 2024 WL 1304037, at *13 (S.D.N.Y. Mar. 27, 2024) ("the SEC does not appear to contest that tokens, in and of themselves, are not securities"); *Payward, Inc*., No. 3:23-cv-06003, ECF No. 90, at *15 (order denying SEC motion to dismiss and noting that the SEC's theory of liability is not that the crypto assets themselves are securities).

[27] *Binance*, 2024 WL 3225974, at *21 n.15 (noting that "[i]n short, the SEC appears to be insisting that the representations made at the outset travel with the token").

[28] *Id*. at *11 (citing SEC's statement to court).

141.    The SEC's embodiment theory makes zero sense, is contradictory on its face, and demonstrates that the SEC is still vigorously pursuing the position that Crypto Asset Securities are themselves a new category of securities and not just the subject of an investment contract.

142.    If a network token "embodies the investment contract" then it can never be sold without this "embodiment" and therefore is all by itself an investment contract—a premise courts have uniformly rejected and the SEC has said it no longer endorses.[29]

143.    The theory also fails because it does not explain why secondary sales of bitcoin and ether are not also Crypto Asset Securities, when those network tokens are sold the same way the Targeted Network Tokens are sold on the secondary-market.

144.    The "embodiment" theory is accordingly a transparent effort by the SEC to continue to assert that these assets are a new category of securities under their oversight in the face of judicial resistance.

145.    By creating a new category of security—a Crypto Asset Security—not found in the federal securities laws, the SEC is avoiding the proper test for whether a transaction involves an "investment contract" to claim jurisdiction over secondary-market sales of nearly all network tokens, including the Targeted Network Tokens.  This violates the law.

146.    Evidence of the SEC's adoption of the Rule classifying network tokens, including Targeted Network Tokens, as Crypto Asset Securities is in numerous public statements, including

---

[29] The SEC also argues in actions that do not involve secondary-market sales that Crypto Asset Securities are themselves regulated as securities.  For example, the SEC recently settled an enforcement action against Galois Capital Management LLC, in which the SEC alleged that the investment adviser failed to maintain its client's Crypto Asset Securities with a qualified custodian.  *In re* Galois Capital Mgmt. LLC, Investment Advisers Act Release No. 6670, 2024 WL 4025963 (Sept. 3, 2024).

the following examples from proposed rules, final rules, orders, and commentary by the SEC chair and the SEC head of enforcement:

    a. Gary Gensler, SEC Chair, *Kennedy and Crypto* (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities. Offers and sales of these thousands of crypto security tokens are covered under the securities laws.") (footnote omitted).

    b. Securities and Exchange Commission, Proposed Rule, Safeguarding Advisory Client Assets, 88 FR 14672, 14676 (proposed Mar. 9, 2023) ("Other advisers offering similar advisory services might take the position that crypto assets are not covered by the custody rule at all.  This, however, is incorrect because most crypto assets are likely to be funds or crypto asset securities covered by the current rule.").[30]

    c. Gary Gensler, SEC Chair, *Statement on Proposed Rules Regarding Investment Adviser Custody* (Feb. 15, 2023), https://www.sec.gov/newsroom/speeches-statements/gensler-statement-custody-021523 ("As the release states, 'most crypto assets are likely to be funds or crypto asset securities covered by the current rule.'").

    d. Securities and Exchange Commission, Proposed Rule, Supplemental Information and Reopening of Comment Period for Amendments Regarding the Definition of "Exchange," 88 FR 29448 (proposed May 5, 2023) ("The reopening [of comments] provides supplemental information and economic analysis regarding trading systems that trade crypto asset securities that would be newly included in the definition of 'exchange' under the Proposed Rules.").[31]

    e. Securities and Exchange Commission, *Exercise Caution with Crypto Asset Securities: Investor Alert* (Mar. 23, 2023), https://www.sec.gov/resources-for-investors/investor-alerts-bulletins/exercise-caution-crypto-asset-securities-investor-alert ("Also, unlike SEC-registered entities, crypto asset securities trading platforms or other intermediaries (such as so-called 'crypto exchanges') may offer a combination of services that are typically performed by separate firms that may each be required to be separately registered with the SEC, a state regulator, or a SRO.").

---

[30] Available at https://www.federalregister.gov/documents/2023/03/09/2023-03681/safeguarding-advisory-client-assets.

[31] Available at https://www.federalregister.gov/documents/2023/05/05/2023-08544/supplemental-information-and-reopening-of-comment-period-for-amendments-regarding-the-definition-of.

f.  Securities and Exchange Commission, Letter Order Denying Petition for Rulemaking, (Dec. 15, 2023), https://tinyurl.com/ms9czw94 ("The Commission disagrees with the Petition's assertion that application of existing securities statutes and regulations to crypto asset securities, issuers of those securities, and intermediaries in the trading, settlement, and custody of those securities is unworkable.")

g.  Gary Gensler, SEC Chair, *Statement on the Denial of Rulemaking Petition Submitted on behalf of Coinbase Global, Inc.* (Dec. 15, 2023), https://www.sec.gov/newsroom/speeches-statements/gensler-coinbase-petition-121523 ("To the extent that entities are acting as clearing or transfer agents with respect to transactions in crypto asset securities, they too are subject to registration[.]").

h.  Gary Gensler, SEC Chair, *Statement on the Approval of Spot Bitcoin Exchange-Traded Products*, (Jan. 10, 2024), https://www.sec.gov/newsroom/speeches-statements/gensler-statement-spot-bitcoin-011023 ("Importantly, today's Commission action is cabined to ETPs holding one non-security commodity, bitcoin. It should in no way signal the Commission's willingness to approve listing standards for crypto asset securities.").

i.  Securities and Exchange Commission, Further Definition of "As a Part of Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers, 89 FR 14938, 14950 (Feb. 29, 2024) ("[T]he Commission is not excluding any particular type of securities, including crypto asset securities, from the application of the final rules.").[32]

j.  Gurbir S. Grewal, Director, SEC Division of Enforcement, *What's Past is Prologue: Enforcing the Federal Securities Laws in the Age of Crypto* (July 2, 2024), https://www.sec.gov/newsroom/speeches-statements/grewal-remarks-age-crypto-070224 (commenting on the role of the SEC in enforcing the federal securities laws with respect to "crypto asset securities").

147.  These statements and others are evidence that the SEC has adopted the Rule and that the SEC, through its commissioners and staff, is applying the Rule in a way that is binding against a broad class of market participants.

148.  On information and belief, the Rule is also documented in the agency's internal memoranda and correspondence.

---

[32] Available at https://www.federalregister.gov/documents/2024/02/29/2024-02837/further-definition-of-as-a-part-of-a-regular-business-in-the-definition-of-dealer-and-government.

149.    The SEC did not follow the APA's notice-and-comment rulemaking requirement before adopting and implementing the Rule.  *See* 5 U.S.C. § 553.

## IV.    The SEC Initiates Lawsuits to Enforce the Rule and Expand Its Jurisdiction to Secondary-Market Network Tokens Sellers.

150.    Instead of engaging in formal notice-and-comment rulemaking, the SEC has adopted an enforcement-first posture to advance the Rule.  Two SEC commissioners have commented that this approach is misguided.[33]

151.    The SEC has taken a sweeping approach to enforcing the Rule against secondary-market platforms, filing at least six enforcement actions against such platforms premised on the Rule and threatening more.[34]

152.    In each, the SEC has alleged that secondary-market sales of certain network tokens, including the Targeted Network Tokens, constitute Crypto Asset Securities under the SEC's oversight.

153.    For instance, just weeks ago, the SEC applied the Rule when it entered into a settlement with eToro USA LLC, the operator of a secondary-market trading platform, and issued

---

[33] *See, e.g.*, Hester M. Peirce, SEC Commissioner, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.* (Feb. 9, 2023), https://www.sec.gov/newsroom/speeches-statements/peirce-statement-kraken-020923 ("Using enforcement actions to tell people what the law is in an emerging industry is not an efficient or fair way of regulating."); Mark T. Uyeda, SEC Commissioner, *Remarks at the "SEC Speaks" Conference 2022* (Sept. 9, 2022), https://www.sec.gov/newsroom/speeches-statements/uyeda-speech-sec-speaks-090922 ("One significant shortcoming of regulation by enforcement is that it fails to provide a mechanism for the Commission to consider the views by market participants, which can result in a myopic approach.").

[34] *See, e.g.*, Robinhood Response to Receipt of Wells Notice from the U.S. Securities and Exchange Commission, ROBINHOOD (May 6, 2024), https://newsroom.aboutrobinhood.com/robinhood-response-to-receipt-of-wells-notice-from-the-u-s-securities-and-exchange-commission.

a cease-and-desist order against eToro regarding the Crypto Asset Securities the SEC alleged were traded on its platform.[35]

154.    Through that order, which was final agency action that definitively applied the Rule, the SEC directed eToro to stop acting as a broker and clearing agency with respect to secondary sales of all crypto assets traded on eToro's platform (including certain Targeted Network Tokens) *other than* (i) bitcoin, (ii) ether, and (iii) a "forked," or copied, version of bitcoin called Bitcoin Cash.

155.    The SEC also ordered eToro to liquidate any "crypto asset securities in a way not unacceptable to the Commission staff within 187 days" of the order.[36]

156.    In announcing the order, SEC Enforcement Director Gurbir Grewal expressly stated that the SEC expects market participants to comply with the Rule about Crypto Asset Securities:

> By removing tokens offered as investment contracts from its platform, eToro has chosen to come into compliance and operate within our established regulatory framework.  This resolution . . . offers a pathway for other crypto intermediaries[.][37]

157.    Thus, the Rule has a direct and immediate effect on Crypto.com by imposing on it the obligation "to come into compliance" with the SEC's "established regulatory framework" for Crypto Asset Securities.

---

[35] *In re* eToro USA LLC, Exchange Act Release No. 101001, 2024 WL 4170253, at *1 (Sept. 12, 2024) ("eToro provided U.S. customers with the ability to trade crypto assets, including crypto asset securities, through its online trading platform (the 'Trading Platform')" and "eToro effected transactions in crypto assets, including crypto asset securities, for customers, as their agent[.]").

[36] *Id.* at *3.

[37] Gurbir S. Grewal, Director, SEC Division of Enforcement, *eToro Reaches Settlement with SEC and Will Cease Trading Activity in Nearly All Crypto Assets* (Sept. 12, 2024), at https://www.sec.gov/newsroom/press-releases/2024-125.

158.    Before the eToro order, the SEC sued several other entities to enforce the Rule.  In April 2023, for example, the SEC sued Bittrex Inc., a secondary-market platform for trading network tokens.  In the complaint, the SEC alleged that Bittrex violated the securities laws by failing to register as a securities exchange, broker-dealer, and clearing agency in connection with transactions involving eight network tokens the SEC alleged to be Crypto Asset Securities.[38]

159.    In June 2023, the SEC sued Coinbase Inc. for alleged violations of the securities laws in connection with the secondary sales of thirteen identified network tokens that occur on its platform.  Like the Bittrex complaint, the SEC's complaint against Coinbase alleges that Coinbase should have registered as a securities exchange, broker-dealer, and clearing agency in connection with those transactions involving alleged Crypto Asset Securities.[39]

160.    Also in June 2023, the SEC filed a complaint against Binance Holdings Limited and certain of its affiliates, alleging that secondary sales of twelve network tokens were transactions involving Crypto Asset Securities.[40]

161.    In November 2023, the SEC sued another secondary-trading platform, Payward, Inc. (d/b/a Kraken), based on similar allegations.  In the complaint against Kraken, the SEC alleged that secondary sales of seven network tokens were transactions involving Crypto Asset Securities.[41]

---

[38] Complaint, *SEC v. Bittrex Inc.*, No. 2:23-cv-000580, ECF No. 1, at *1 (W.D. Wash. Apr. 17, 2023) ("The assets made available on the Bittrex Platform include crypto asset securities.").

[39] Complaint, *SEC v. Coinbase Inc.*, No. 1:23-cv-04738, ECF No. 1, at *1 (S.D.N.Y. June 6, 2023) ("The assets that Coinbase makes available include crypto asset securities.").

[40] Complaint, *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599, ECF No. 1, at *1 (D.D.C. June 5, 2023) ("Defendants have unlawfully solicited U.S. investors to buy, sell, and trade crypto asset securities through unregistered trading platforms[.]").

[41] Complaint, *Payward, Inc.*, No. 3:23-cv-06003, ECF No. 1, at *2 ("Without registering with the SEC in any capacity, Kraken has simultaneously acted as a broker, dealer, exchange, and clearing agency with respect to these crypto asset securities.").

162.    In June 2024, the SEC sued Consensys Software Inc., alleging in part that Consensys failed to register as a broker in connection with the offer and sale of certain network tokens that the SEC claimed were Crypto Asset Securities.[42]

163.    The Targeted Network Tokens at issue in this case are available for sale on Crypto.com's Platform and have been alleged by the SEC, in one or more of those six cases, to be "representative samples"[43] or part of a "non-exhaustive list"[44] of Crypto Asset Securities available on the secondary-market platforms at issue.

## V.    *Binance* Court Rejects the SEC's Position that Secondary-Market Sales of Network Tokens Are Securities Transactions.

164.    As alleged above, the SEC's application of the Rule to Crypto.com is based on the invented assertion that secondary-market sales of virtually all network tokens, including the Targeted Network Tokens, are Crypto Asset Securities because they "embody" the promises and obligations made by the issuer to the initial buyers.

165.    This "embodiment" concept has never before been applied by the SEC to any other asset.  For good reason: it has no foundation in the law.[45]

---

[42] Complaint, *SEC v. Consensys Software Inc.*, No. 1:24-cv-04578, ECF No. 1, at *2 (E.D.N.Y. June 28, 2024) ("MetaMask Swaps is a digital platform that brokers transactions in crypto asset securities on behalf of MetaMask Swaps users—including retail investors in crypto asset securities.")

[43] Transcript of Oral Argument at 105, *Binance Holdings Ltd.*, No. 1:23-cv-01599, ECF No. 212 (D.D.C. Jan. 26, 2024).

[44] Complaint, *Coinbase Inc.*, No. 1:23-cv-04738, ECF No. 1, at *28; Complaint, *Binance Holdings Ltd.*, No. 1:23-cv-01599, ECF No. 1, at *87; Complaint, *Payward, Inc.*, No. 3:23-cv-06003, ECF No. 1, at *15.

[45] The Supreme Court has consistently rejected agency claims to "discover" new powers "in a long-extant statute."  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

166.     Moreover, it was rejected by one federal court, which noted that "[the] SEC seemed to be speaking out of both sides of its mouth."  *SEC v. Binance Holdings Ltd.*, No. 23-1599, 2024 WL 3225974, at *21 n.15 (D.D.C. June 28, 2024).

167.     In *Binance*, the SEC alleged that network tokens sold on the Binance secondary-market platform were Crypto Asset Securities.[46]

168.     On this issue, the *Binance* Court ruled that the SEC had not alleged enough to support the inference that a reasonable secondary buyer would expect that the funds they expended in purchasing the network token would be used by the secondary-market platform to deliver profits back to them.

169.     In doing so, the *Binance* Court expressly found the SEC's embodiment theory to be inconsistent with *Howey*:

> Insisting that an asset that was the subject of an alleged investment contract is itself a "security" as it moves forward in commerce and is bought and sold by private individuals on any number of exchanges, and is used in any number of ways over an indefinite period of time, marks a departure from the *Howey* framework that leaves the Court, the industry, and future buyers and sellers with no clear differentiating principle between tokens in the marketplace that are securities and tokens that aren't.[47]

170.     The *Binance* Court also chastised the SEC for bringing claims against secondary-market sellers but not the issuers of the network tokens in question and dismissed the SEC's

---

[46] In response to criticism for its use of the term "Crypto Asset Security," the SEC stated in a recent motion in *Binance* that it would no longer use that term in that case, although on the same day the SEC used the term multiple times in the eToro enforcement action (*see supra* ¶¶ 153-156).  *See* SEC Motion for Leave to Amend the Complaint, *SEC v. Binance Holdings Ltd.*, No.1:23-cv-01599, ECF No. 273.  Regardless of the term it applies, it is clear from the SEC's actions that the Rule that network tokens, including the Targeted Network Tokens, are to be regulated as securities and incapable of being sold outside of a securities transaction remains in full effect.

[47] *Binance*, 2024 WL 3225974, at *22.

allegations as related to the network tokens at issue in that case, including the following Targeted Network Tokens: SOL, ADA, FIL, ATOM, ALGO, and BNB.

171.    In dismissing, in part, the SEC's allegations against the Binance defendants, the *Binance* Court cited approvingly the approach taken in *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 324 (S.D.N.Y. 2023), which analyzed whether *primary-market* sales of the network token XRP that occurred between the XRP issuer and buyers on *secondary-market* exchanges were investment contracts.[48]

172.    The *Ripple* Court found that the sales of XRP on these platforms were transactions that could *not* meet the *Howey* criteria because they lacked any promises or commitments flowing from the issuer to the buyer and any connection between buyers and the issuer's promotional material.

173.    This was because they were "blind" sales of XRP between the XRP issuer and buyers who were unaware they were purchasing the asset directly from the issuer.  Thus, the *Ripple* Court reasoned, buyers had no reasonable basis on which to expect that their funds would go to the issuer or that they would receive profits from the issuer's efforts in using the sale proceeds.

174.    In citing the *Ripple* decision, the *Binance* Court found that the blind sales in *Ripple* were analogous to the secondary-market transactions at issue in *Binance*.  Based on that, the court adopted *Ripple*'s logic in holding that sales of network tokens on secondary-markets cannot be investment contracts because they lack the essential elements of *Howey*.

175.    The reasoned decisions in *Ripple* and *Binance* stand in stark contrast to the SEC's overreaching view of its own authority with respect to secondary sales of network tokens, including the Targeted Network Tokens.

---

[48] *Id.* at *19.

## VI.    Legislative Efforts Show that Congress Has Not Authorized the SEC to Regulate Secondary-Market Sales of Network Tokens.

176.    As alleged above, the SEC lacks authority from Congress to oversee secondary-market sales of any network tokens, including the Targeted Network Tokens.[49]

177.    Moreover, the federal securities laws, as currently written, are not capable of regulating network tokens or the platforms on which they are sold.

178.    Because of the unique characteristics inherent to the decentralized global networks underlying network tokens, and how those networks differ from the type of corporate issuers the Securities Act and Exchange Act were designed to oversee, issuers of network tokens and platforms selling network tokens are simply not capable of registering with the SEC even if they wanted to, absent rulemaking to address the gaps caused in the application by the nature of the technology involved.[50]

179.    Market participants have described the many challenges and obstacles they face when they engage the SEC in discussions about registering with the SEC in some capacity.[51]

---

[49] *See* Commissioner Hester Peirce ("[W]e likely need more . . . statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us."), https://www.sec.gov/newsroom/speeches-statements/peirce-remarks-duke-conference-012023.

[50] *See* Hester M. Peirce, SEC Commissioner, *Outdated: Remarks before the Digital Assets at Duke Conference* (Jan. 20, 2023) ("[W]e tell people to come down to the office to talk to us about their projects, plug the information they give us into our proprietary security-identifying algorithms, and then send the people home with a court date. Hardly a reasonable way forward[.]"), https://www.sec.gov/newsroom/speeches-statements/peirce-remarks-duke-conference-012023; *see also Oversight of the U.S. Securities and Exchange Commission: Wall Street's Cop Is Finally Back on the Beat: Hearing Before the H. Comm. On Fin. Servcs.*, 117th Cong. (Oct. 5, 2021), https://www.govinfo.gov/content/pkg/CHRG-117hhrg46010/html/CHRG-117hhrg46010.htm (Gary Gensler, SEC Chair, discussing crypto rules and stating, "if we need to adjust some of these sometimes very technical rules that were written in a different environment, we should see what we can adjust").

[51] *See, e.g.*, Paradigm Policy Lab, *Due to SEC Inaction, Registration is Not a Viable Path for Crypto Projects*, Paradigm (Mar. 23, 2023), https://policy.paradigm.xyz/writing/secs-path-to-registration-part-i; *see also* Testimony of Daniel M. Gallagher, Chief Legal, Robinhood Markets, Inc., Before U.S. House of Representatives House Financial Services Subcommittee on Digital

180.    Despite this institutional obstacle, the SEC has rebuffed requests made by the digital asset industry, and its own Commissioners, to engage in official rulemaking.[52]

181.    Congress has recognized in a bipartisan fashion that there exists a need for comprehensive federal regulation, including a process to register, that addresses the unique technological challenges inherent to regulating primary and secondary sales of network tokens.

182.    For several years, alongside representatives from the digital asset industry, Congress has been actively contemplating, debating, and advancing legislation to provide a legal framework for network tokens, including registration and a registration process. *See, e.g.*, H.R. 1628, §§ 2-5 (Mar. 8, 2021) ("Token Taxonomy Act"); H.R. 4451 §§ 2(a)(2)-(5), 3 (July 16, 2021) ("Securities Clarity Act"); H.R. 7614, § 2 (April 28, 2022) ("Digital Commodity Exchange Act of 2022"); H.R. 8373, § 2 (Sept. 24, 2020) ("Digital Commodity Exchange Act of 2020"); H.R. 4741 §§ 206, 404 (July 28, 2021) ("Digital Asset Market Structure and Investor Protection Act"); S. 2281 §§ 404, 602 (July 12, 2023) ("Lummis-Gillibrand Responsible Financial Innovation Act"); S. 4356 § 404 (June 7, 2022) ("Lummis-Gillibrand Responsible Financial Innovation Act"); S. 4760 § 2 (Aug. 3, 2022) ("Digital Commodities Consumer Protection Act of 2022"); H.R. 8730 § 2 (Aug. 19, 2022) ("Digital Commodities Consumer Protection Act of 2022").

---

Assets (Sept. 18, 2024), https://tinyurl.com/28h79su3 (describing the SEC staff as "generally non-responsive to Robinhood's requests for guidance or feedback on how to move its registration proposal forward"); Paul Grewal, Chief Legal Officer, Coinbase, Inc., *We asked the SEC for reasonable crypto rules for Americans. We got legal threats instead* (Mar. 22, 2023), https://tinyurl.com/yr3f4utm.

[52] *See generally supra* note 33; *see also* Securities and Exchange Commission Letter Order Denying Petition for Rulemaking (Dec. 15, 2023), https://tinyurl.com/ms9czw94.

183.    These proposals have been introduced specifically to define the regulatory jurisdiction over network tokens and blockchain technology among various regulators, including the SEC, the Commodity Futures Trading Commission ("CFTC"), and individual states.[53]

184.    None of these legislative efforts propose delegating to the SEC the broad authority over secondary-market sales of network tokens or the registration requirements as a consequence of such sales that the SEC has claimed under the Rule.

185.    As recently as May 2024, the United States House of Representatives advanced a bill with significant bipartisan support that would grant the CFTC—not the SEC—substantial authority over network tokens.  H.R. 4763 (May 22, 2024) ("Financial Innovation and Technology for the 21st Century Act").

186.    Senate Majority Leader Chuck Schumer has said he intends to take up comprehensive digital asset legislation by the end of the year,[54] and the Biden Administration stated it is "eager to work with Congress to ensure a comprehensive and balanced regulatory framework for digital assets[.]"[55]

---

[53] *See* Brief of Amicus Curiae State of Montana Supported by Seven Other States, *SEC v. Payward, Inc.*, No. 3:23-cv-06003, ECF No. 51-1, at *2 ("States have a strong interest in preventing the potential preemption of consumer protection and other state laws by the SEC's attempt to regulate crypto assets as securities[.]").

[54] MacKenzie Sigalos, *Schumer says a crypto bill can pass Senate this year; key Dems join 'Crypto4Harris' call*, CNBC (Aug. 14, 2024), https://www.cnbc.com/2024/08/14/schumer-says-crypto-legislation-can-pass-the-senate-this-year-on-crypto4harris-.html.

[55] Executive Office of the President, *Statement of Administration Policy, H.R. 4763—Financial Innovation and Technology for the 21st Century Act* (May 22, 2024),vhttps://tinyurl.com/avv4dvtz.

187.    Yet despite these advancing legislative efforts, or perhaps because of them, the SEC has rebuked calls by Congress and the industry to engage in official rulemaking or participate in the legislative process.[56]

188.    As current SEC Commissioner Hester Peirce wrote in response to her agency's enforcement-first agenda and refusal to engage in notice and comment rulemaking:

> Why no rule? If they are all securities, then voila—problem solved! But if we seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking, we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us. And Congress might decide to give that authority to someone else.[57]

189.    Rather than obtain authority through proper channels, the SEC has authorized multiple actions to enforce the unlawful Rule in order to exert authority over secondary-market sales of most network tokens, including the Targeted Network Tokens.  *See supra* ¶¶ 151-162.

190.    The SEC's imminent threat to make Crypto.com its next public target in its effort to expand its jurisdiction is unlawful and must be stopped.

## CLAIMS FOR RELIEF

### Count I—Agency Action In Excess of Statutory Authority

191.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

---

[56] *See supra* note 52; *see also* Brief of Amicus Curiae U.S. Senator Cynthia M. Lummis, *SEC v. Payward, Inc.*, 3:23-cv-06003, ECF No. 41-1, at *8 ("Although the SEC seeks broad authority over crypto asset markets, most legislative proposals in Congress would instead grant much of that authority to other agencies.  Unsatisfied, the SEC seeks to circumvent the political process to commandeer that authority for itself."); Brief of Amicus Curiae State of Montana Supported by Seven Other States, *SEC v. Payward, Inc.*, 3:23-cv-06003, ECF No. 51-1 ("The SEC's claim of authority is also politically significant.  Congress has considered dozens of legislative proposals about cryptocurrency, including whether crypto assets should be treated as securities regulated by the SEC or commodities regulated by the Commodity Futures Trading Commission.")

[57] Peirce, *Outdated: Remarks before the Digital Assets at Duke Conference*.

192.    The Court has inherent power to award equitable relief, including declaratory relief, when federal officers exceed their authority under federal statutes. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–29 (2015).

193.    Crypto.com faces a genuine threat of enforcement by the SEC in regard to secondary-market sales of the Targeted Network Tokens on the Platform.

194.    The SEC has investigated Crypto.com, its officers, directors, employees, partners, subsidiaries, and/or affiliates for alleged violations of the federal securities laws in connection with the secondary-market sales of network tokens on the Platform.

195.    The SEC has already brought numerous enforcement actions against leading companies in the digital asset industry similarly situated to Crypto.com, alleging similar purported violations, premised on the allegation that secondary-market sales of the Targeted Network Tokens are securities transactions.

196.    Just as the SEC claimed in many of those previously filed actions, the SEC has asserted to Crypto.com that secondary-market transactions involving network tokens on the Platform violate the federal securities laws.

197.    In addition, the SEC has told Crypto.com that it views Crypto.com to be operating as a securities broker-dealer and securities clearing agency under the federal securities laws because it facilitates secondary-market sales in network tokens, including the Targeted Network Tokens.

198.    The SEC is exceeding its statutory authority by threatening an enforcement action against Crypto.com in regard to secondary-market sales of the Targeted Network Tokens on the Platform, precisely as the SEC has done in at least six other enforcement actions that precede this threat.

199.    The Targeted Network Tokens are not themselves securities under federal securities laws.  Nor are they sold on Crypto.com's Platform as part of an investment contract.

200.    Crypto.com is not operating as an unregistered securities broker-dealer or securities clearing agency under federal securities laws.

201.    The acts the SEC has taken to threaten an enforcement action against Crypto.com premised on sales of the Targeted Network Tokens are *ultra vires*.

202.    Crypto.com seeks declaratory and injunctive relief to prevent the SEC from subjecting Crypto.com to an unlawful enforcement action regarding secondary-market sales of the Targeted Network Tokens on Crypto.com's Platform.

### Count II—Violation of Administrative Procedure Act
### Agency Action In Excess of Statutory Authority

203.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

204.    The Rule is contrary to law and exceeds the agency's statutory authority because secondary-market sales of the Targeted Network Tokens are not securities transactions.

205.    The Court should set aside and enjoin the SEC from enforcing the Rule against Crypto.com because it is contrary to law and exceeds the agency's statutory authority.

### Count III—Violation of Administrative Procedure Act
### Arbitrary or Capricious Agency Action

206.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

207.    The Rule is arbitrary and capricious because the SEC has treated the Targeted Network Tokens differently than similarly situated digital assets—*i.e.*, bitcoin and ether.

208.    The Targeted Network Tokens are similarly situated to bitcoin and ether because they are functionally identical and sold in the secondary-market to customers in an identical manner on the Platform.

209.    The Rule treats the Targeted Network Tokens differently than bitcoin and ether by declaring that secondary-market sales of the Targeted Network Tokens are securities transactions while secondary-market sales of bitcoin and ether are not.

210.    The SEC has never provided a reasoned explanation for treating the Targeted Network Tokens differently than bitcoin and ether.

211.    By determining that secondary-market sales of the Targeted Network Tokens are securities transactions, but that secondary-market sales of bitcoin and ether are not, the SEC unreasonably failed to treat similarly situated network tokens similarly.

212.    Moreover, the SEC failed to acknowledge or explain its change of course: Despite previously concluding that secondary-market sales of two network tokens are not securities transactions, *see supra* ¶¶ 124-127, the SEC did not acknowledge this prior determination when it adopted the Rule or reasonably explain its policy shift.

213.    In addition, the SEC failed to consider an important aspect of the problem because secondary-market platforms like Crypto.com are not capable of registering as securities broker-dealers or securities clearing agencies given the SEC's failure to address gaps in the regulatory process caused by the nature of the technologies involved.[58]

214.    But the SEC has refused calls to provide a way for secondary-market platforms like Crypto.com to register, instead choosing to enforce the Rule to require secondary-market sellers of network tokens to register with the SEC when doing so is impossible.

---

[58] *See supra* note 51.

215.    The natural result of this strategy is that the SEC has weaponized the Rule as a *de facto* ban on most digital assets in order to threaten the business of secondary-market network token platforms like Crypto.com.[59]

216.    The Court should set aside and enjoin the SEC from enforcing the Rule against Crypto.com because it is arbitrary and capricious.

### Count IV—Violation of Administrative Procedure Act
### Failure to Observe the Notice and Comment Procedure Required by Law

217.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

218.    The Rule is a legislative rule for which the agency was required to, but did not, undertake notice-and-comment rulemaking.  5 U.S.C. § 553.

219.    Despite previously concluding that secondary-market sales of two network tokens (bitcoin and ether) are not securities transactions, the SEC now requires secondary platforms like Crypto.com that engage in or facilitate secondary trades in Targeted Network Tokens (and network tokens generally) to comply with federal securities laws and register as securities broker-dealers and securities clearing agencies.

220.    By adopting the Rule without complying with the APA's rulemaking procedures, the SEC denied Crypto.com an opportunity to comment on the new Rule.  And it is clear that "[a]

---

[59] Joint Statement of Commissioners Hester M. Peirce and Mark T. Uyeda, *On Today's Episode of As the Crypto World Turns* (March 5, 2024), https://www.sec.gov/newsroom/speeches-statements/peirce-uyeda-statement-crypto-world-turns-03-06-24 ("It is entirely unclear how ShapeShift was to discern that the Commission would consider crypto assets generally—and any crypto asset in particular—a security in the form of an investment contract.  Even now, ten years on, it is hardly more discernable.  But perhaps that ambiguity is exactly the result the Commission wants.").

party may not lawfully be adversely affected by a rule promulgated in violation of the requirements of the APA." *Shell Offshore Inc.*, 238 F.3d at 626 (citing 5 U.S.C. § 552(a)(1)).

221.    The Court should set aside the Rule and enjoin the SEC from enforcing the Rule against Crypto.com because the agency failed to comply with the APA's notice-and-comment rulemaking requirement.

[*Remainder of Page Left Blank*]

## **PRAYER FOR RELIEF**

WHEREFORE, Crypto.com respectfully requests that an order and judgment be entered in its favor and against Defendants:

a.   Declaring that secondary-market transactions of the Targeted Network Tokens on Crypto.com's Platform are not securities transactions as defined by the Securities Act and Exchange Act;

b.   Declaring that Crypto.com is not a securities broker-dealer or securities clearing agency required to be registered under the Exchange Act for offering and operating the Platform on which secondary-market transactions of the Targeted Network Tokens occur;

c.   Declaring that the SEC does not have regulatory authority to pursue any enforcement action against Crypto.com that is premised on the notion that secondary-market transactions of the Targeted Network Tokens are securities transactions or that Crypto.com is an unregistered securities broker-dealer, securities clearing agency, or any other entity regulated under the federal securities laws by virtue of the Platform conducting secondary-market transactions of the Targeted Network Tokens;

d.   Granting permanent injunctive relief to prevent the SEC and its officers and agents from pursuing any enforcement action that is premised on the notion that secondary-market transactions of the Targeted Network Tokens on the Platform are securities transactions or that Crypto.com is an unregistered broker-dealer or clearing agency under the federal securities laws for offering the Platform on which secondary-market transactions of the Targeted Network Tokens occur;

e.  Setting aside the Rule and enjoining the SEC from enforcing the Rule against Crypto.com;

f.  Awarding Crypto.com its costs, attorneys' fees, and expenses; and

g.  Entering such other and further relief as the Court may deem just and proper.

[*Remainder of Page Left Blank*]

Dated: October 8, 2024

Respectfully submitted,

/s/ *Mark W. Rasmussen*

Noel J. Francisco (*pro hac vice* forthcoming)
D.C. Bar No. 464752
Brett A. Shumate
D.C. Bar No. 974673
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  +1.202.879.3939
Facsimile:  +1.602.626.1700
E-mail: njfrancisco@jonesday.com
E-mail: bshumate@jonesday.com

Mark W. Rasmussen (Lead Attorney)
Texas State Bar No. 24086291
Jonathan D. Guynn
Texas State Bar No. 24120232
Timothy M. Villari
Texas State Bar No. 24125870
JONES DAY
2727 North Harwood Street
Dallas, TX 75201-1515
Telephone:  +1.214.220.3939
Facsimile:  +1.214.969.5100
E-mail: mrasmussen@jonesday.com
E-mail: jguynn@jonesday.com
E-mail: tvillari@jonesday.com

Michael E. Jones
Texas Bar No. 10929400
mikejones@potterminton.com
E. Glenn Thames, Jr.
glennthames@potterminton.com
Texas Bar No. 00785097
POTTER MINTON
A Professional Corporation
102 N. College, Suite 900
Tyler, Texas 75702
(903) 597-8311 (Telephone)
(903) 593-0846 (Facsimile)

ATTORNEYS FOR PLAINTIFF